In the Matter of the Compensation of
Lester J. Wilson, Claimant.
WILLAMETTE POULTRY COMPANY et al,
*Petitioners,*
*v.*
WILSON,
*Respondent.*
(No. 80-06346, CA A23560)

654 P2d 1154

Peter L. Barnhisel, Corvallis, argued the cause for petitioners. With him on the brief was Fenner, Barnhisel, Morris & Willis, Corvallis.

Robert W. Muir, Albany, argued the cause for respondent. With him on the brief was Emmons, Kyle, Kropp & Kryger, Albany.

Before Gillette, Presiding Judge, and Warden and Young, Judges.

WARDEN, J.

## WARDEN, J.

The issue in this workers' compensation case is the extent of claimant's disability. Employer seeks reversal of a Board order affirming the referee's award of permanent total disability.

Claimant, a 41-year-old truck driver, suffered a lumbo-sacral strain while placing a pallet jack onto his truck. Back surgery, a laminectomy and diskectomy, was performed on October 13, 1979, two months after the accident. Dr. Tsai, the treating neurosurgeon, reported a satisfactory post-operative course. Claimant suffered aching below the incision, with some pain occasionally radiating down the upper portion of the left leg. Dr. Tsai further reported no motor weakness and no sensory "dermatome." He prescribed no pain medication but advised claimant to walk two miles a day. He recommended job placement with weight-bearing limited to an occasional 25 pounds, with no turning or twisting.

Claimant was authorized employment re-entry services and was referred to VERK Consultants. After an initial interview and vocational testing, the consultants found that the main problem was claimant's lack of motivation. Claimant told the consultants that he experienced constant aching that often increased to intense pain. He was adamant in his belief that his physical condition could be improved by additional medical attention and that he was not capable of returning to employment until further improvement occurred. In addition to what the consultants deemed an attitudinal problem, claimant is also limited by his illiteracy. Although he actually completed six years of school, he can write only his name and read only simple road signs. Testing revealed that he was qualified for only a few occupations, including truck-driving, operating machines, electric-wire rewinding and time-keeping. It was recommended that claimant enroll in an adult basic education course through a community college to learn to read and write.

Convinced that Dr. Tsai's treatment had been inadequate, claimant sought additional medical attention from Dr. Cronk, who diagnosed degenerative lumbo-sacral disc disease with some functional overlay. He

recommended that claimant be evaluated by Orthopedic Consultants, who diagnosed chronic lumbo-sacral strain and concluded that the condition was not stationary. They recommended supervised physical therapy and a repeat myelogram.

During the next few months claimant continued treatment with Dr. Cronk. He showed some physical improvement but continued to complain of nearly constant severe pain. Electric shock and physical therapy were tried but were discontinued by claimant as unhelpful. He was referred to Dr. Throop for neurological consultation, who also recommended that a second myelogram be performed. During that time, claimant enrolled in a community college literacy course but discontinued it because he was in "too much pain." On May 5, 1980, employment re-entry service was withdrawn, because claimant felt that he was physically unable to benefit from vocational rehabilitation.

On May 14, 1980, a second myelogram was performed. Dr. Cronk reported that it "failed to reveal any convincing abnormalities." He concluded that claimant was ready either to return to some form of light work or enroll in a pain clinic. In June, 1980, rehabilitation counseling was again authorized. On July 7, 1980, claimant was awarded temporary total disability and 15 percent unscheduled low back disability. He continued to be treated by his family physician, Dr. Neal, who, on September 23, 1980, reported:

> "I feel that he is now ready to be released to work and that he could do light duty which consisted of not doing any lifting over twenty five pounds and not doing any work where he would be involved in any prolonged stooping, where he would not be involved in repetitive twisting and bending and where he could break up his time so that he would not have to be sitting in one position for long hours. I do feel that this man is capable of employment under these limitations and perhaps in the future those restrictions might even be lifted if he continues to improve."

Claimant returned to VERK Consultants. On their advice, he applied in Salem and Albany for work as a bus driver, even though he did not feel he was "really able to do it." He also applied to Willamette Landfill to drive a "Cat on the dump." He testified that his former employer would

take him back whenever he was capable of truck-driving or would hire him if "he had something that he thought I could do." A vocational counselor offered claimant a 13-week course in bench-welding in Portland, but he refused, because he did not want to be away from his home. Another rehabilitation consultant concluded that claimant could handle the work of a security guard and would be limited to light, sedentary work.

Claimant does not contend that his physical impairment is complete. Rather, he argues that his physical condition, coupled with his age, illiteracy and limited experience, effectively precludes him from regularly performing work at a gainful and suitable occupation. Employer maintains that claimant's lack of "motivation" to rejoin the work force is a major factor in his inability to secure employment. The referee found that claimant had satisfied his burden to establish that he is permanently and totally disabled as a result of his industrial injury. Relying on *Wilson v. Weyerhaeuser,* 30 Or App 403, 567 P2d 567 (1977), he concluded that claimant's physical conditions of less than total incapacity together with his limited personal resources amounted to permanent total disability as defined by ORS 656.206. On *de novo* review, we reach a different conclusion.

The burden to prove permanent total disability is on the claimant. *Wilson v. Weyerhaeuser, supra.* The worker is also required to establish that he is willing to seek regular gainful employment and that he has made reasonable efforts to obtain employment. ORS 656.206(3). Claimant has not met this statutory requirement.

Claimant's case has been referred to VERK Consultants three times since his surgery, and twice the consultants' job development efforts were thwarted by claimant's adamantly asserted belief, despite the opinions of his doctors, that he is physically incapable of returning to work. Throughout the vocational reports, there are references to claimant's "unrealistic belief" that he will improve physically to the degree that he will be able to return to truck driving. Concern is also expressed that he not "succumb to a lifestyle pattern which is focused on his personal pain experience" and that he may be "avoiding confronting

returning to employment, being active on a daily basis since that is unknown to him." These concerns appear to be borne out by claimant's refusal to take welding classes, his failure to pursue literacy courses and his application only for jobs that entail driving vehicles, even though he feels that he is incapable of physically performing the work required. Claimant professes a strong desire to work but explains that presently he is not "rushing in to" apply for jobs because:

"* * * at the present time I could not go out here and hold down a job, so why should I mess up a possibility of maybe that being a permanent job later on, when if I go out there and work a day or two and have to take a week off to recuperate, or if I work a week and have to take a week or two off, there's nobody around — there's too many unemployed people to put up with something like that there. I feel I don't want to mess up my chance of having maybe a job at that place later on when I am able to do it."

Claimant is not on pain medication and is not involved in physical therapy. At the time of the hearing, however, he was enrolled in a pain clinic. The medical reports refer to subjective symptoms of back pain and indicate that claimant's complaints are excessive and unsubstantiated by physical examination. This is supported by the second myelogram, which revealed "no convincing abnormalities." At the hearing, claimant reiterated his belief that the doctors had not exhausted all avenues of treatment and voiced his disagreement with the medical reports:

"Q. Well, if the doctor says that physically you are able to handle such and such a job would you go ahead and try your best?

"A. It just depends on what job it was. If there is something I know — because the doctor does not know how I feel, I can tell him how I feel, or I can tell you — but if I felt that it was going to damage me, no, I wouldn't do it.

"Q. Not even if the doctor said —

"A. No, not even if the doctor said, because he don't know how I hurt. He don't know how I feel. I can tell him, but, no, if you or anybody say, 'Hey, here's a job, you do that,' if I felt it was going to damage me I don't care if it was my doctor or who it was, I would tell him no. And just like here a while back —

"Q. Okay. Now, wouldn't you be able to trust what the doctor is able to test out on your muscles and nerves and your whole body? Don't you feel you could be confident and trust those tests and those things that he is able to determine, as to whether or not you are able to do such and such a thing?

"A. That's not telling me how bad a pain I got. And it's not all in my head."

The evidence does not justify an award of permanent total disability. The vocational experts testified that claimant is capable of performing certain jobs. Efforts toward rehabilitation and job development have been met with strong resistance. Claimant meets any job suggestion other than truck-driving with undue apprehension. His asserted belief that he hurts too much to seek employment or to develop literacy skills does not relieve him of the statutory requirements. *Smith v. SAIF,* 51 Or App 833, 627 P2d 495 (1981); *Potterf v. SAIF,* 41 Or App 755, 598 P2d 1290 (1979).

■ There remains the issue of the extent of claimant's permanent partial disability, measured by the loss of earning capacity resulting from his compensable injury. ORS 656.214(5). Taking into account claimant's age, limited education, training, skills and work exposure, we find that he is entitled to an award of 80 percent unscheduled permanent partial disability.

The order of the Board is modified to award claimant 80 percent unscheduled permanent partial disability.